# JOHN HAYS HAMMOND

*va.*

## ADDISON G. Du BOIS.

*Trover*: *conversion of corporation stock; failure of proof.*

In an action of trover, for the conversion of stock of a corporation, it was held that the appellee, plaintiff below, failed to make out a case. p. 155

By his subsequent ratification or acquiescence, a principal may be made liable for the unauthorized acts of his agent; but for this principle to apply the acts, claimed to have been ratified, must appear to have been the deeds of one acting as agent for or on behalf of the principal. p. 154

An action of trover can not be maintained without conversion, either direct or constructive. p. 152

When there is no evidence of any intention on the part of the defendant either to take to himself property in the goods of the plaintiff, or, in any manner, to deprive the plaintiff of them, there is no conversion. p. 152

When the plaintiff in such a case fails in proving an actual conversion, it is necessary for him to prove that there was a demand made, and a refusal, at the time when the defendant had the power to make delivery. p. 152

Demand and refusal, where the defendant had no power to make delivery, have no effect, either to give the plaintiff a right of action or to fix the measure of damages. p. 153

*Decided June 27th, 1917.*

Appeal from the Superior Court of Baltimore City. (GORTER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Edward N. Rich* and *Joseph C. France,* for the appellant.

*John C. Gittings* and *William Pepper Constable* (with whom was *George Winship Taylor* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

On the 6th of June, 1907, Willard D. Doremus, Addison G. Du Bois and others, of Washington, D. C., parties of the first part, entered into a contract with John P. Miller, of Virginia, party of the second part, which recites: "That whereas the said parties of the first part are the owners for the United States of the entire right, title and interest in a certain invention of said Doremus, being an improvement in cotton ginning machinery for which application for letters patent of the United States was filed in the United States Patent Office, May 17, 1907, by said Doremus, and whereas said party of the second part is desirous of securing said entire right, title and interest in and to said invention, and in and to the letters patent, which may be granted for said invention by the United States of America." The agreement then provided that in consideration of the sum of $50,000, to be paid by Miller as therein specified, the parties of the first part did thereby grant, bargain and sell unto him, his heirs and assigns, "all the right, title and interest in and to said invention, and in and to any improvements thereon that may be made by said Doremus, and in and to the letters

patent for said invention, and for said improvements thereon that may be hereafter granted by the United States."

On the 27th day of June, 1907, Doremus assigned and transferred to Miller "the entire right and interest in and to any and all patents which may be obtained in accordance with this agreement in countries foreign to the United States on said cotton gin, and on any and all improvements thereon," in consideration of the agreement that he was to receive one-half of the profit, in bonds, stocks or money, realized from the sale of letters patent in the United States or in foreign countries, and on the first day of July, 1907, Miller, in consideration of ten dollars, "and other valuable consideration," sold to Addison G. Du Bois "one-fourth part of the entire net proceeds from said invention derived from either United States or foreign patents on said invention, whether the proceeds shall be in money, stocks, bonds or other thing or things of value." Thereafter the National Cotton Improvement Company was organized under the laws of Maine, and its entire capital stock of $1,500,000, except a few organization shares, was issued to Miller for the American rights to the Doremus invention, and the Doremus patents were assigned to that company by Miller and by Doremus. There was also formed a corporation called the Doremus Holding Company, to which Doremus assigned his application for the foreign rights, and the stock of the latter company was held by Doremus, Miller and Daniel J. Sully. Miller gave to one John J. Welch an option on the majority of the stock of the National Cotton Improvement Company, and through Welch the Doremus invention was brought to the attention of the appellant in this case, John Hays Hammond. Mr. Hammond referred the matter to Mr. Sully, with whom he was interested in a plan for warehousing cotton, for investigation and a report as to the value of the invention, and Mr. Sully reported that in his opinion the Doremus invention was very valuable and "would revolutionize the whole cotton industry."

Welch failed to make the payments under his option, and his rights became forfeited, and on the 28th of December, 1909, John P. Miller, John Hays Hammond and Daniel J. Sully entered into the following agreement:

> "Agreement made this twenty-eighth day of December, 1909, between John P. Miller, party of the first part, and John Hays Hammond and Daniel J. Sully, acting for a syndicate to be composed of themselves and one or more other persons, parties of the second part, witnesseth:
>
> "Whereas the party of the first part is the owner of $471,200 at par of the preferred stock and $967,-200 at par of the common stock of the National Cotton Improvement Company; and
>
> "Whereas the parties of the second part are about to incorporate, or cause to be incorporated, a corporation to be known as the General Cotton Securities Company, or some other suitable name, for the purpose of promoting the incorporation and organization of and holding the stock and other securities of corporations engaged in the ginning, warehousing and general development of the cotton business, which said corporation is to have a capital of $7,000,000 common and $3,000,000 preferred stock, which preferred stock is to be 7% cumulative, with a preference as to assets upon dissolution without participation in profits beyond 7%, and without voting power as long as the 7% dividend is paid; and
>
> "Whereas the party of the first part desires to sell his stock to the said corporation to be formed and to take in payment therefor cash and common stock, and the parties of the second part desire to obtain the same for the new corporation and also propose to finance the said corporation by the sale of this preferred stock.
>
> "Now, therefore, this agreement witnesseth that in consideration of the premises and of the mutual covenants and agreements herein contained the parties hereto agree to and with each other as follows, to wit:

"1.  The party of the first part agrees to deliver to the parties of the second part $471,200 at par of the preferred stock and $967,200 at par of the common stock of the National Cotton Improvement Company, the certificates for the same duly endorsed for transfer to be lodged with John Hays Hammond forthwith.

"2.  The party of the first part agrees to accept in payment for the said stock $37,500 in cash to be paid upon the delivery of the certificates as hereinbefore provided, $1,000,000 in full-paid common capital stock of the new corporation and $1,000,000 in full-paid preferred stock thereof, it being understood and agreed, however, that the common capital stock of the new corporation may be transferred upon the issuance thereof into the names of John Hays Hammond, D. J. Sully and Frank S. Bright, as voting trustees, to be held by them for a period not exceeding five years, which voting trust is to be established for the purpose of maintaining a continuous and efficient administration of the new corporation during the period of its formation, promotion and commencement of its operations, and in the event that such voting trust is formed the party of the first part agrees that the $1,000,000 of common stock may be paid and delivered in the shape of certificates of beneficial interest in that amount of stock, subject to a voting trust.  The parties of the second part may, if necessary to effect the sale of the preferred, withdraw or omit from the voting trust so much of the common stock as may be used as bonus on such sales, provided that at all times at least a majority of the common stock shall be subject to said trust.

"3.  Party of the first part agrees that the parties of the second part may transfer the said stock of the National Cotton Improvement Company to the new corporation upon such terms and conditions as will provide for the issuance by the new corporation to the parties of the second part of $3,000,000 at par of its common stock and $3,000,000 at par of its pre-

ferred stock, the balance of the common stock to remain unissued, to be issued hereafter at the discretion of the Board of Directors for cash or property, in accordance with the needs of the corporation, provided, however, that in addition to receiving from parties of the second part the stock of the National Cotton Improvement Company, the new corporation shall also receive from the sale by parties of the second part of the stock to be transferred to them $1,600,000, which sum is to be paid into the treasury of the new corporation by the parties of the second part as the same is derived from the sale of the preferred and common stock of the new corporation issued by it to the parties of the second part.

"4. The party of the first part agrees that the $1,000,000 of preferred stock to be issued to him as aforesaid shall be lodged with the syndicate, of which parties of the second part are members and for which they are acting in executing this agreement for sale by them so as to net to party of the first part the sum of $400,000.

"5. The parties of the second part agree upon the deposit of the said certificates of stock of the National Cotton Improvement Company with John Hays Hammond aforesaid to pay to the party of the first part $37,500 in cash, and to proceed forthwith to incorporate the new corporation and to procure the issuance of its stock to them as hereinbefore provided, and when and as soon as the same is issued to establish a voting trust as above provided, and deliver to party of the first part certificates of beneficial interest, subject to the voting trust, in $1,000,000 par of the common stock of the new corporation, and to receive and hold for the account of the party of the first part $1,000,000 at par of the preferred stock of the new corporation. They further agree to transfer the said stock of the National Cotton Improvement Company to the new corporation, and to enter into an agreement with it to use their best endeavors to sell $2,000,000 of

its preferred stock and so much as may be necessary
of the common stock which they receive, so as to net
to its treasury the sum of $1,600,000. For the purposes
of sale, the $2,000,000 of preferred stock to be sold
for the new corporation and the $1,000,000 preferred
stock to be sold for the party of the first part, shall be
taken and considered as one block, and the parties of
the second part shall use their best endeavors in every
respect to sell and market the same. Upon the sale
of each share of said preferred stock there shall be
paid out of the proceeds of such sale by the parties of
the second part to the party of the first part the sum
of $14 in cash until the sum of $400,000 has been paid
in full as herein provided for, and a proportionate
amount shall be paid into the treasury of the new
corporation until the $1,600,000 herein provided for
has been paid in full. Any sum or sums of money
received by parties of the second part from the sale of
the $1,000,000 preferred stock in excess of the sum
of $400,000 shall belong to parties of the second part
as and for their compensation for carrying out this
agreement. The parties of the second part shall be
under no personal liability by virtue of this agree-
ment, except to transfer the stock received by them
from the party of the first part to the new corpora-
tion, to pay the sum of $37,500 in cash, to deliver to
party of the first part $1,000,000 in common stock or
voting trust certificates, to receive for the account of
party of the first part $1,000,000 preferred stock, to use
their best endeavors to sell said $1,000,000 of preferred
for the party of the first part and $2,000,000 preferred
for the new corporation, and to account to party of
the first part and to the new corporation for their re-
spective proportions of the moneys received from the
said sales.

"6. It is understood and agreed by and between the
parties hereto that all deliveries of stock and all pay-
ments of moneys herein provided to be made to party
of the first part may be made to Frank S. Bright, as

his representative, and the parties of the second part shall not be accountable or responsible for the distribution by him of the securities or moneys among the other parties if any entitled thereto.

"In witness whereof the parties hereto have hereunto set their hands the day and year first above.

Jno. P. Miller.<br>John Hays Hammond.<br>D. J. Sully.

Ralph Polk Buell."

In pursuance of the above agreement, the General Cotton Securities Company was incorporated under the laws of Delaware, and the "first meeting of the corporation" was held at its office in Wilmington, Delaware, on the 5th day of January, 1910. On the 7th of January, 1910, the General Cotton Securities Company entered into the following contract with Daniel J. Sully:

"This agreement, Made the 7th day of January, 1910, between Daniel J. Sully, party of the first part, and General Cotton Securities Company, a corporation of the State of Delaware, party of the second part.

"Whereas Daniel J. Sully, party of the first part, has offered to deliver to this company $471,200 at par of the preferred stock and $967,200 at par of the common stock of the National Cotton Improvement Company, a corporation of the State of Maine, with a total authorized and outstanding issue of $500,000 preferred stock and $1,000,000 common stock, and to pay into the treasury of the party of the second part $1,600,000 as and when payment thereof is demanded, in consideration of the issuance to him by the party of the second part of $3,000,000 at par of the preferred and $3,000,000 at par of the common stock, full paid and non-assessable, of this company; and

"Whereas the said National Cotton Improvement Company is the owner of valuable patents and patent rights in an improved cotton gin known as the 'Dore-

mus 'Gin,' and by virtue of said ownership the stock which said party of the first part has offered to convey is in the estimation of the board of directors of party of the second part, worth not less than $5,000,000 and is necessary for the purposes and objects of the incorporation of party of the second part.

"Now, therefore, this agreement witnesseth, That, in consideration of the premises and of the mutualities of this agreement, the parties hereto covenant to and with each other as follows, to wit:

"First—Party of the first part hereby agrees to deliver or cause to be delivered to party of the second part one certificate of the preferred and one or more certificates of the common stock of the National Cotton Improvement Company, aggregating 4,712 shares of the said preferred stock and 9,672 shares of the common stock thereof, properly executed and endorsed for transfer, the said delivery to be made to the treasurer of the party of the second part.

"Second—Party of the first agrees to pay to the party of the second part from time to time, upon its demand, the sum of $1,600,000 in cash, without interest, and agrees to make the said payments at such times and in such amounts as the party of the second part may nominate.

"Third—Party of the second part agrees to execute and deliver to the party of the first part, upon the delivery to it of the certificates of stock hereinbefore provided for of the National Cotton Improvement Company one or more certificates of the preferred stock and of the common stock of party of the second part, aggregating $3,000,000 at par of the preferred and $3,000,000 at par of the common, which stock is hereby declared to be and is full paid and non-assessable.

"In witness whereof the party of the first part has signed and sealed this agreement and the party of the second part has caused the same to be executed by its President and its corporate seal to be hereunto affixed,

duly attested by its secretary the day and year first
above written.

                    Daniel J. Sully.                    (Seal)
                    General Cotton Securities Company,
Attest:                    By Ralph Polk Buell, President.
    C. H. Stanton,
                    Secretary."


On the 7th of January, 1910, an agreement was entered
into between John Hays Hammond, Daniel J. Sully and
Frank S. Bright, as constituting voting trustees, and the
stockholders of the General Cotton Securities Company, by
which the common stock of the company was placed in the
hands of the voting trustees for the period of five years upon
the trustees issuing therefor to the stockholders common
stock trust certificates. This agreement was signed by
Daniel J. Sully as the holder of 29,965 shares of the com-
mon stock. On the same day a syndicate composed of
Daniel J. Sully, John Hays Hammond, Harris Hammond,
Mont D. Rogers and D. B. Atherton was formed for the
purpose of selling three million dollars of preferred stock
and $750,000 of the common stock of the General Cotton
Securities Company. This syndicate agreement recited that
Mr. Sully had acquired from the General Cotton Securities
Company $3,000,000 of its preferred stock and $3,000,000
of its common stock, and provided that each member of the
syndicate was to use his best endeavors to sell the $3,000,000
of preferred and $750,000 of the common stock; that the
preferred stock was to be offered for sale at the "price of $100
for each $100 par value of preferred stock and $25 par value
of common stock if payments therefor be made in one sum,
but for the price of $105 for like amount of preferred and
common stock if payment be made in instalments;" that Dan-
iel J. Sully should be syndicate manager, for the purposes
therein specified, and that the $3,000,000 of preferred and
$750,000 of common stock should be transferred to Daniel J.
Sully into his hands as syndicate manager and the certifi-

cates therefor deposited in some trust company, to be selected by him, under an agreement by which the purchasers of the stock were to make payments therefor to the trust company. On the 9th of February, 1910, Daniel J. Sully delivered to the United States Trust Company of Washington, D. C., certificate No. 1 for 30,000 shares of the preferred stock of the General Cotton Securities Company, and certificate No. 3 for 7,500 shares of the common stock voting trust certificates of the company, both certificates being in his name as syndicate manager, which the Trust Company agreed to hold in accordance with the terms of his letter of that date, and in accordance with the provisions of the syndicate agreement. On the 3rd of February, 1910, John P. Miller executed the following declaration of trust:

### "Declaration of Trust.

"Whereas I, John P. Miller, have this day received the following described common stock trust certificates of the General Cotton Securities Company:

No.   4—2550 shares. . . . . . . .John P. Miller, Trustee.
No.   5—1550 shares. . . . . . . .John P. Miller, Trustee.
No.   6— 100 shares. . . . . . . .John P. Miller, Trustee.
No.   7— 100 shares. . . . . . . .John P. Miller, Trustee.
No.   8— 100 shares. . . . . . . .John P. Miller, Trustee.
No.   9— 100 shares. . . . . . . .John P. Miller, Trustee.
No. 10— 100 shares. . . . . . . .John P. Miller, Trustee.
No. 11—2275 shares. . . . . . . .John P. Miller, Trustee.
No. 12—1500 shares. . . . . . . .John P. Miller, Trustee.
No. 13— 500 shares. . . . . . . .John P. Miller, Trustee.
No. 14— 500 shares. . . . . . . .John P. Miller, Trustee.
No. 15— 400 shares. . . . . . . .John P. Miller, Trustee.
No. 16— 110 shares. . . . . . . .John P. Miller, Trustee.
No. 17— 165 shares. . . . . . . .John P. Miller, Trustee.

"And whereas I have redelivered said certificates for deposit in escrow for the period of 18 months, and said certificates have been deposited in a safe deposit box, rented in the names of Daniel J. Sully and F. S. Bright.

"And whereas said certificates are deposited under an agreement that they shall not be sold for said period.

"And whereas I am the owner of certificate Number 11 for 2,275 shares of said common stock.

"And whereas I hold the others in trust.

"Now, therefore, I, John P. Miller, trustee, do hereby declare that upon the termination of said escrow Willard D. Doremus will be entitled to receive said certificates Numbers 4, 5, 6, 7, 8, 9 and 10; Addison G. Du Bois will be entitled to receive certificates Numbers 12, 13, 16 and 17; and F. S. Bright will be entitled to receive certificate Number 14; and Wm. Muerling will be entitled to receive certificate Number 15; and said voting trustees are hereby authorized and dirested to transfer said common stock trust certificates to the individuals thereto entitled as above indicated.

"This declaration of trust is to be deposited with said certificates and is to be irrevocable, without the consent in writing of the beneficiaries hereto.

"In testimony whereof, I hereunto set my hand and seal this 3rd day of February, A. D. 1910, at the City of Washington, District of Columbia.

John P. Miller, (Seal)
Trustee."

On the 4th of March, 1910, Mr. Sully, Mr. Hammond, Mr. Miller, Mr. Harris Hammond, Mr. Bright, Mr. Atherton, treasurer of the General Cotton Securities Company, and Mr. Baldwin met at the office of the National Cotton Improvement Company in the Union Trust Building in Washington. Mr. Sully gave Mr. Bright an order on the United States Trust Company of Washington for certificate A-3 for 30,000 shares of preferred stock of the General Cotton Securities Company, and Mr. Bright got the certificate of stock from the Trust Company and brought it back to the meeting. Certificate A-3 was then cancelled, and certificate No. 5-A was issued to John P. Miller for 10,000 shares, and certificate

No. 6-A for 4,000 shares was issued to Daniel J. Sully, syndicate manager. The 10,000 shares were transferred by Miller to Daniel J. Sully, syndicate manager, and a certificate therefor, being certificate 7-A, was issued to him. Certificates 6-A and 7-A were then returned to the United States Trust Company by Mr. Bright and receipted for by that company, and the remaining 16,000 shares were turned into the treasury of the General Cotton Securities Company.

It thus appears from the evidence referred to that the American patents for the Doremus invention were purchased by Miller in 1907 from Doremus and others interested therein for fifty thousand dollars. The National Cotton Improvement Company, which will hereafter be referred to as the Improvement Company, was then organized with a capital stock of $1,500,000, and the American patents were transferred by Miller to that company in consideration of 96 per cent. of its entire capital stock, and the patents were assigned by Miller and by Doremus to the company. Upon the organization of the General Cotton Securities Company, Miller transferred to that company the stock of the Improvement Company in consideration of the payment of $37,500 in cash, and $1,000,000 of the common stock and $1,000,000 of the preferred stock of the latter company. It also appears from the evidence that the $37,500 was paid by Mr. John Hays Hammond to Mr. Bright, who paid the same to Mr. Miller, Mr. DuBois, Mr. Doremus and others interested therein, and that Mr. Hammond had previously paid the $12,500, being the balance of the $50,000 which Mr. Miller had agreed to pay for the American rights.

From the organization of the General Cotton Securities Company in January, 1910, until the fall of 1910, Mr. Sully was actively engaged in trying to sell the stock of the Securities Company, and to dispose of the foreign rights in the Doremus invention. To that end he made several trips to England, and a number of tests were made of cotton gins constructed in accordance with the Doremus patent. The

cost of these tests as well as the personal expenses of Mr. Sully were borne by Mr. Hammond. In September and October, 1910, serious differences arose between Mr. Hammond and Mr. Sully, which resulted in Mr. Hammond telling Mr. Sully that he would not make any further advances to him for his personal use, but that he would make further efforts himself to sell the stock of the company and would pay the cost of any further tests of the Doremus gin. Mr. Sully then threatened to issue a prospectus and to sell the stock of the company, and Mr. Hammond told him that if he did he would "repudiate" the prospectus in every paper in the country. The attitude of Mr. Hammond being, according to his own testimony, that it would not be honest to sell the stock of the company until the value of the Doremus invention could be fully demonstrated by further tests of the gin. Following this interview Mr. Sully wrote Mr. Hammond as follows:

"Office of Vice-President and General Manager.

Washington, D. C., October 12, 1910.

Mr. John Hays Hammond,

71 Broadway,

New York, N. Y.

Dear Sir:

I enclose you herewith a copy of a letter which I have tendered to Mr. John P. Miller today.

Yours truly,

Daniel J. Sully.

P. S.—I have informed Mr. Miller and his associates that you yesterday absolutely refused to furnish any more money, which you were obliged to do under our contract, for the further protection of the General Cotton Securities Company. And that you notified me that you would repudiate in every newspaper in the country any prospectus that I might issue.

D. J. S."

The letter enclosed to Mr. Hammond was as follows:

"Washington, D. C., October 12, 1910.
Mr. John P. Miller,
    Washington, D. C.
Dear Sir:

Under a contract made with you the 28th day of December, 1909, between John Hays Hammond and myself jointly, acting as a syndicate, which was to be composed of John Hays Hammond and myself and one or more other parties, wherein we entered into a contract with you whereby we were to organize a corporation with the capital stock of $7,000,000 common and $3,000,000 preferred stock, which preferred stock was to be 7% cumulative, with a preferment as to assets upon dissolution without participation in profits beyond 7%. And also we desired to obtain from you your interest in the National Cotton Improvement Company, for the General Cotton Securities Company; and also obligated ourselves to finance the said General Cotton Securities Company by the sale of the preferred stock of the General Cotton Securities Company, and to use our best endeavors to sell the preferred stock to meet the obligations which we entered into with you.

"Under that contract now, therefore, please take notice that the General Cotton Securities Company was formed, under the requirements of that contract the syndicate was formed; also under the requirements of that contract I have used my best endeavors to get the consent of my co-partner (John Hays Hammond) to co-operate with me in placing this stock where it could be sold. I have been unable to so do.

"Therefore, to absolve myself from any liability financially or morally respecting the contract I herewith inform you that I will on your demand proceed as far as I can to turn back to you legally all and any of the right or interests that I may have under this contract.

Yours truly,
                    Daniel J. Sully."

On the 12th of October Mr. Sully also wrote Mr. Hammond tendering his resignation as a director of the General Cotton Securities Company to take effect when the board of directors accepted the same. Mr. Hammond and Mr. Sully met again on the 6th of November, when, according to the testimony of Mr. Hammond, friendly relations between him and Mr. Sully were partially restored, with the understanding that Mr. Hammond would take up active measures to establish the value of the Doremus invention with the view of selling the stock of the company, and arrangements were made for a meeting of the directors. On the 16th of November the directors met at the office of the company in Washington and the meeting resulted in a further breach between Mr. Hammond and Mr. Sully, and no action on the part of the directors. Following this meeting W. D. Doremus and A. G. DuBois wrote to Mr. Hammond, Mr. Sully and Mr. Bright, as the board of trustees, advising them that they were interested to the extent of three-fourths in the trust certificates issued by them to John P. Miller, and stating: "Our information is to the effect that an alleged meeting of the board of directors held at the office of the company on Wednesday, the 16th inst., the previous minutes of the board of directors, or what was supposed to be the previous minutes of the board of directors (which were, in fact, made by a board differently constituted from those who were present the 16th inst.), were physically altered in an attempt to release the gentlemen interested in the syndicate, for whom Daniel J. Sully was acting, from the obligation to pay into the treasury of the company, upon demand made therefor, the sum of $1,600,000, as provided for under the contract made by the former president of the company with said Sully, acting for said syndicate, under date of January 7, 1910." The letter also demanded that the board of trustees request the president of the company to call a special meeting of the stockholders for the purpose of removing the then board of directors. On the same day Messrs. DuBois and

Doremus wrote to Mr. Atherton, the treasurer of the General Cotton Securities Company, calling his attention to the fact that there was in his possession the preferred and common stock of the *Improvement Company;* stating that they had been informed of certain illegal action taken by the board of directors of the Securities Company on the 16th of November which was greatly to their detriment as the beneficial owners of three-fourths of the trust certificates issued to John P. Miller, and demanding that he retain in his possession the stock of the National Cotton Improvement Company until a proper board of directors could be elected by the stockholders of the Securities Company. They also wrote to Mr. Hammond informing him that they were interested in the stock held by Mr. Miller, and that "Among the conditions on which the delivery of the stock of the General Cotton Securities Company by it to Mr. Sully was the agreement that he made on behalf of the syndicate to pay in the treasury of the said company the sum of $1,600,000;" that they had been informed that an attempt had been made to alter the contract made by Mr. Sully with the company so as to relieve the syndicate of the payment to the company of said sum of $1,600,000, and that they were advised that such action was absolutely illegal. The letter concluded by stating that they would hold him personally responsible for any injury suffered by them by reason of any change or transfer of the stock then standing in the name of John P. Miller.

Mr. DuBois and Mr. Doremus also wrote to Mr. Miller, on the 18th of November, 1910, as follows:

"Dear Sir:

Under the several agreements in existence between us you have been authorized to act in our behalf and interests in relation to the stock in the National Cotton Improvement Company, which stood in your name alone, and as you know, we acquiesced in the agreement made by you in December, 1909, with the syndicate represented by John Hays Hammond and Daniel J. Sully. In carrying out the agreement in behalf

of the syndicate, we are all aware of the fact that the General Cotton Securities Company, through its president and secretary, secured a contract from Mr. Sully made in behalf of the syndicate that was greatly to the advantage of all of us, as under its terms the syndicate is required to pay into the treasury of that company upon demand $1,600,000.

Through our consent you have been the representative member for our joint interests on the board of directors of the General Cotton Securities Company, we assuming, of course, that you would in every way protect our mutual interests. If we have been correctly informed, you have failed to appreciate that the recent action taken by the board of directors of the General Cotton Securities Company, or what is supposed to be a board of directors, at a meeting held in this city on Wednesday, the 16th inst., has jeopardized our rights. We feel sure that you must appreciate that in agreeing to the minutes of the previous meeting held by the board of directors in New York on January 7th, 1910, should be physically changed so as to relieve the syndicate from its obligation to pay into the treasury of the company $1,600,000 upon demand, practically places us in the position of being at the mercy of the syndicate. Consequently, we demand that you take necessary steps to at once protect the interests of all of us in the stock of the National Cotton Improvement Company, which was turned over by you through the syndicate to the General Cotton Securities Company, by such appropriate action in the premises that will impress that stock with the trust that you represent in our behalf.

Yours respectfully,

W. D. Doremus.
A. D. Du Bois."

It is apparent that the theory upon which Mr. Doremus and Mr. Du Bois acted in writing these letters was that Mr. Hammond was personally liable for the $1,600,000 which

Mr. Sully agreed to pay to the Securities Company, and that
the course they pursued was based upon the assumption that
there had been a formal meeting of the board of directors of
the Securities Company on the 16th of November, 1910.
There are no minutes of such a meeting in the record, and
there are no grounds upon which Mr. Hammond could be
held liable for the sum named.

After receiving the letter from Mr. Du Bois and Mr. Do-
remus, Mr. Hammond tried to arrange for a meeting be-
tween himself and Mr. Du Bois and Mr. Doremus, and went
to Washington on November 19th to meet Mr. Doremus for
the purpose of explaining to him that he was not liable for
the $1,600,000 referred to in Mr. Sully's contract with the
company, and that the directors had not attempted on No-
vember 16th to do anything that would prejudice his inter-
est.    While in Washington on the 19th of November Mr.
Hammond learned from Mr. Bright that Mr. Sully had exe-
cuted a contract on behalf of the Securities Company with
the Fordyce Company, which involved the stock of the Se-
curities Company.    Mr. Bright would not explain to him the
exact terms of the contract, and Mr. Hammond immediately
telegraphed to Mr. Atherton, the treasurer of the Securities
Company, who was then in Little Rock, Arkansas, that he
had just learned of an "attempted contract" between Mr.
Sully, on behalf of the Securities Company, and the Fordyce
Company, but that he was not acquainted with the details,
and directing him to wire Mr. Fordyce, Sr., in St. Louis,
that Mr. Sully had no authority to make the contract; that it
was in violation of the syndicate agreement, and absolutely
void.

A special meeting of the board of directors of the General
Cotton Securities Company was called, and was held at the
New York office of the company on the 23rd day of Novem-
ber, 1910.    The minutes of that meeting show that the re-
turn of the $1,600,000 of the preferred stock of the com-
pany to the treasurer of the company was approved; that

the letter of Daniel J. Sully to John P. Miller of October 12th, 1910, a copy of which was sent by Mr. Sully to Mr. Hammond, was presented to the board, and with it the following communication from Mr. Hammond to Mr. Miller referring to Mr. Sully's letter:

"Since the receipt of that letter I have made great efforts to carry out the contract of December 28th, 1909, which is referred to in Mr. Sully's letter to you. I find I also am entirely unable to carry out the contract of December 28th, 1909, which is referred to in Mr. Sully's letter to you. I find I also am entirely unable to carry out the unfulfilled provisions of that contract, and I, therefore, join with Mr. Sully in informing you that I will, on your demand, proceed as far as I can to turn back to you legally all and any of the rights or interests that I may have under that contract.

Yours truly,

John Hays Hammond.

P. S.—I made this proposal to you by word of mouth on Saturday, November 19th, 1910, and I am writing this to formally confirm my verbal proposal.

J. H. H.

We hereby assent to the above proposal as members of said syndicate.

Harris Hammond.
D. B. Atherton."

Mr. John Hays Hammond then offered "on behalf of the vendors (the members of the syndicate), those members present assenting thereto," to return the stock of the company received by them upon the acceptance by the company of the proposal, except the forty-nine shares held by the directors and officers of the company, to permit the cancellation of the certificates for the same. Mr. Miller stated that he had written a letter to Mr. Sully accepting the proposal contained in his letter of October 12th, 1910, "and demanded the redelivery to him of the capital stock of the National Cot-

ton Improvement Company as on the terms set forth in Mr. Sully's letter." Thereupon the board of directors adopted the following resolution:

"Whereas heretofore this company entered into an agreement with Daniel J. Sully as set forth in the minutes of the first meeting of the board of directors whereby there was transferred to this company 4,712 shares of the preferred and 9,672 shares of the common stock of the National Cotton Improvement Company for certain considerations moving from this company, to wit, $3,000,000 at par of common stock of this company, and $1,400,000 of preferred stock of said company; and

"Whereas thereby and thereunder Daniel J. Sully obligated himself personally to pay on demand for the additional $1,600,000 of the preferred stock of this company issued to him and his associates; and

"Whereas the aforesaid agreement was entered into on or about the 7th day of January, 1910, and it appears from the statements of the vendors to this company (other than Mr. Sully and Mr. Rogers) of the said National Cotton Improvement Company's stock, who were present at this meeting, that no sales of this company's stock have been effected, and that all efforts put forth by said vendors to effect such sales have thus far failed; and

"Whereas the said vendors present hereat are unable to state definitely when any sales can be effected by them under said agreement; and

"Whereas the said John P. Miller has received the offers made by each of the vendors aforesaid embodied in letters read to this board;

"Resolved, That it is to the interest of the General Cotton Securities Company that it accede to the request of the said vendors, and thus enable the said vendors to meet the demand of the said John P. Miller for the return of the National Cotton Improvement Company's stock aforesaid, and that a refusal on their part in their opinion will inevitably precipitate a long and

expensive litigation and otherwise complicate and dis-
astrously affect the affairs of this company.

"Resolved further, That this company hereby accepts
the offer of the vendors to rescind the contract afore-
said and to return to it the balance of this com-
pany's capital stock, available for this purpose, to wit,
$2,995,100 of common stock of said company and $1,-
400,000 par value of its preferred stock which, together
with the preferred stock already returned, constitutes
the entire stock outstanding under said contract, less
49 shares held by the directors and officers of the com-
pany; and that the certificates for all of said shares
of this company, except the directors' shares, be and
they are hereby called in and cancelled.

"Resolved further, That the treasurer and secretary
of this company be and they are hereby authorized and
directed to return the shares of the capital stock of the
National Cotton Improvement Company and the cer-
tificates therefor in accordance herewith, and to can-
cel on the books of this company the aforesaid shares
of this company, except the 49 shares of common stock
which are not available for this purpose, and to take
such other and further action in the premises as may
be necessary or proper.

"Resolved further, That this company execute by its
proper officers an assignment of all of its right, title
and interest in and to any applications of John R.
Fordyce for claimed improvements upon the Doremus
Gin to National Cotton Improvement Company, the
owner of the said original patents to whom same under
the circumstances and in equity and good faith be-
long, provided the said National Cotton Improvement
Company pays to this company by way of reimburse-
ment the expenses incurred by it or its officers incident
to the preparation, filing and assignment of said ap-
plications, not, however, to exceed the sum of $165.00.

"Resolved, That in addition to any other notice that
may be required by the foregoing action, that notice
of the cancellation of the certificates of the capital

stock of this company be given by the treasurer to the
United States Trust Company, Washington, D. C., be-
ing certificates A-6 for 4,000 shares of the preferred
stock of said company, and A-7 for 10,000 shares."

On the day following the meeting of the directors just
referred to Mr. Hammond left New York on a trip to Rus-
sia. After his return to America, Willard D. Doremus and
Addison G. Du Bois filed a bill of complaint against him, the
National Cotton Improvement Company, Daniel J. Sully,
Frank S. Bright, John P. Miller and the United States Trust
Company, on the 3rd of March, 1911, in the Supreme Court
of the District of Columbia. The bill is a lengthy one, cover-
ing sixteen pages of the printed record, and it is only neces-
sary in this case to set out the prayers for relief, which were
as follows:

"2. That the court pass a decree herein directing
the defendants, Daniel J. Sully and Frank S. Bright,
to deliver to the plaintiff, Willard D. Doremus, trust
certificates Nos. 4, 5, 6, 7, 8, 9 and 10, representing the
shares of common stock of the General Cotton Se-
curities Company, and deliver to Addison G. Du Bois
trust certificates Nos. 12, 13, 16 and 17, representing
the shares of common stock of the General Cotton Se-
curities Company.

"3. That the court pass a decree herein directing
the defendants, John Hays Hammond, Daniel J. Sully
and Frank S. Bright, upon the presentation and deliv-
ery to them of the trust certificates of beneficial inter-
ests Nos. 4 to 10, inclusive, and 12, 13, 16 and 17 by
the plaintiff, to deliver to said plaintiffs the common
stock represented thereby.

"4. That the court pass a decree herein authoriz-
ing and directing the United States Trust Company to
forthwith deliver to the plaintiff Doremus out of the
10,000 shares of preferred stock now in its possession
5,000 shares and to the plaintiff Du Bois 2,500 shares.

"5.   That the defendant, the National Cotton Improvement Company, be enjoined *pendente lite* and permanently from entering into any contract of any kind or description with anyone in relation to the Doremus patents or any improvements thereon, or transferring upon its books any stock that now stands in the name of John P. Miller, trustee.

"6.   That the defendant, John P. Miller, be enjoined *pendente lite* and permanently from entering into any contract of any kind or description with anyone in relation to the stock now in his possession and standing on the books of the National Cotton Improvement Company in the name of John P. Miller, or John P. Miller, trustee, and that the court pass a mandatory order in this cause demanding that John P. Miller forthwith return to the lawful treasurer of the General Cotton Securities Company all the stock or the certificates for shares of stock of the National Improvement Company received by him from the treasurer or any other officer of the General Cotton Securities Company either previous to or subsequent to the 23rd day of November, 1910, and to assign or reassign any patents or applications for patents in relation to any improvements made upon the cotton gin conceived by the Thomas Fordyce Manufacturing Company, or John R. Fordyce, and assigned by Fordyce, or the Fordyce Manufacturing Company to the General Cotton Securities Company."

Daniel J. Sully answered the bill on behalf of the National Cotton Improvement Company as its first vice-president, in which all of the allegations of the bill were admitted. The Supreme Court held that Mr. Sully "was the instigator of the suit; that he was made a party defendant to conceal the same, and to make use of whatever advantage the act afforded the plaintiff by his position as defendant," and on the 27th of November, 1911, entered a decree dismissing the bill. The plaintiffs appealed to the Court of Appeals of the District of Columbia and obtained a reversal of the decree

of the Supreme Court. In disposing of the case on appeal,
CHIEF JUDGE SHEPARD said:

"The Court below was right in holding that no juris-
diction had been acquired of the National Cotton Im-
provement Company by the service of the process in
this case. * * * The answer for said corporation, pur-
porting to have been filed by Daniel J. Sully, as vice-
president, did not have the effect to bring the corpora-
tion before the court. The corporation had a presi-
dent, as well as a vice-president; and without pausing
to consider whether Sully was actually its vice-presi-
dent at the time, it does not appear that he had any
authority as such officer to enter its appearance, or
answer for it in this suit. *Ambler* v. *Archer*, 1 App.
D. C. 94-106. It does not seem that it was to its in-
terest to appear voluntarily. On the contrary, its
answer would seem to have been filed by Sully in the
interest of the plaintiffs. The entire record of the case
furnishes an example of corporate formation, stock
watering and manipulation that is made possible by the
character of the corporation laws in force in many of
the States, as well as by the absence of restraining leg-
islation in the District of Columbia.

"Assuming, what may reasonably be inferred from
the circumstances in evidence, that Sully stimulated
this litigation, desiring thereby to accomplish some
purposes of his own, it does not follow that plaintiffs
shall lose any substantial rights they may be entitled
to under the allegations of their bill. It remains to
be inquired what these are, if any, and if they may be
adjudicated in the present proceeding with the parties
properly before the court. So far as inquiry into the
corporate proceedings of the General Cotton Securities
Company, looking to the correction of its minutes, and
the legality of its election of directors and other offi-
cers, is involved, that corporation is a necessary party.
But being a foreign corporation, if it were a party,
the courts of this jurisdiction would have no power to
control its internal affairs and the administration of

its corporate functions. *Clark* v. *Mutual Reserve Fund Life Asso.,* 14 App. D. C. 154-175, 43 L. R. A. 390; *Barley* v. *Gittings,* 15 App. D. C. 427-443. It does not appear that the administration of the internal corporate affairs of the National Cotton Improvement Company is necessarily involved, nor would it be a necessary party to a mere determination of the right to the ownership of its capital stock as between rival claimants thereof, if such were the object of this suit. * * * Whatever rights the plaintiffs may have are narrowed to the ownership of the shares of the General Cotton Securities Company held in trust by the United States Trust Company, as against John P. Miller. Said Miller is a necessary party to this determination; and whether as against him the plaintiffs are entitled to a decree determining the question of ownership is a question that can not be considered because Miller is not before the court. It was error to dismiss the bill because of the belief that Sully had instigated it against the other defendants. The decree will therefore be reversed and the cause remanded, whereupon the plaintiffs may have it retained for a reasonable time for an opportunity to obtain service of process upon John P. Miller, and to amend their bill if so advised."

After the case was remanded to the Supreme Court, MR. JUSTICE ANDERSON. in disposing of it, said:

"This is a suit by Willard D. Doremus and Addison G. Du Bois seeking certain injunctive relief against John P. Miller, and further seeking to have delivered to the plaintiffs by the other defendants certain certificates for shares of common stock and preferred stock in the General Cotton Securities Company, which certificates are located within this District and are claimed to belong to the plaintiffs.

"The case came on for final hearing before Mr. Justice Wright, and a decree was entered dismissing the bill. An appeal was prosecuted from such decree, and

the Court of Appeals reversed the same, remanding the case for further proceedings upon the sole question of the ownership of said certificates of stock as against John P. Miller.

"The Court of Appeals said: 'Whatever rights the plaintiffs may have are narrowed to the ownership of the shares of the General Cotton Securities Company held in trust by the United States Trust Company, as against John P. Miller. Said Miller is a necessary party to this determination, and whether as against him the plaintiffs are entitled to a decree determining the question of ownership, is a question that can not be considered because Miller is not before the court.' (*Doremus* v. *N. C. Imp. Co.*, 41 W. L. R. p. 8.)

"The Court of Appeals further said, in overruling the motion for rehearing: 'Whatever may be the concession regarding the ownership of this stock by the other defendants, who moreover have no interest therein, there is and could be no concession by Miller, who was never a party to this case.'

"At that time Miller had not been brought into the case either by personal service or publication.

"Since the case was remanded, service by publication has been obtained against Miller, and a decree *pro confesso* entered, and subsequently made absolute, against him.

"The case is now submitted to the court for the entry of a final decree directing the delivery of the certificates claimed by the plaintiffs. In this situation, the Court of Appeals having held that the other defendants have 'no interest therein,' and having remanded the case for the sole purpose of determining the ownership of said shares 'as against John P. Miller,' this court, in view of Miller's default and the *pro confesso* against him, must necessarily enter a decree directing the defendants to deliver to the plaintiffs the certificates for common and preferred stock in the General Cotton Securities Company as claimed by them. Whether the General Cotton Securities Company

will recognize them when presented for transfer in view of their supposed cancellation, is a question with which this court can have no concern, and can only be determined in the proper forum in a proceeding in which said company may be made a party.

. "A decree will accordingly be entered directing the defendants to deliver to the plaintiffs the certificates for stock in the General Cotton Securities Company as claimed."

In accordance with this opinion, the Supreme Court on the 2nd day of June, 1913, passed the following decree:

"This cause came on for final hearing this term and was duly argued by counsel, and it appearing to the court that the complainants are entitled to the relief sought by the bill of complaint, filed in this cause, and thereupon and upon consideration thereof, it is this 2nd day of June, 1913, adjudged, ordered and decreed that the defendants, Daniel J. Sully and Frank S. Bright, be and they hereby are jointly and severally commanded to deliver to the complainant, William D. Doremus, or to his attorney, trust certificates Nos. 4, 5, 6, 7, 8, 9 and 10, representing respectively shares of common stock of the General Cotton Securities Company, and to Addison G. Du Bois trust certificates Nos. 12, 13, 16 and 17, representing respectively shares of the common stock of the General Cotton Securities Company, such delivery to be made by said defendants to said complainants or to their attorneys of record, within ten days from the date of the execution of this decree.

"And it is hereby further adjudged, ordered and decreed that the defendants, John Hays Hammond, Daniel J. Sully and Frank S. Bright, be and they hereby are commanded to deliver to the complainants respectively, or to their attorneys of record, the number of shares of common stock of the General Cotton Securities Company held by them as voting trustees, as are represented by trust certificates Nos. 4, 5, 6, 7, 8, 9

and .10, and trust certificates Nos. 12, 13, 16 and 17, or if all of the common stock in said defendants' hands are embraced in one certificate, then and in that event, said defendants and each of them, are hereby commanded to execute a proper assignment to each of the plaintiffs for the number of shares of common stock of said General Cotton Securities Company, as are represented by the trust certificates aforesaid, and attach to said assignment the certificates of stock held by them, and a certified copy of this decree, and deliver the said assignment and decree to the attorneys of record for the complainants with a letter addressed to the General Cotton Securities Company, duly signed by said defendants, authorizing and directing said company to transfer on its books the number of shares represented by the assignment and shown by this decree that the complainants are respectively entitled to, and to issue and deliver to said complainants or their assigns, new stock certificates therefor, said delivery to be made within ten days after the presentation to said defendants or to their attorneys of record in this cause by the complainants respectively of the trust certificates herein mentioned.

"It is hereby further adjudged, ordered and decreed that the defendant, the United States Trust Company, deliver to the said complainant, Willard D. Doremus, five thousand (5,000) shares, and to the said complainant, Addison G. Du Bois, twenty-five hundred (2,500) shares, of the preferred stock of the General Cotton Securities Company heretofore placed in its possession as trustee by the defendant, Daniel J. Sully, or should the shares of preferred stock of the General Cotton Securities Company held by it, be embraced in a certificate or certificates of such denominations that it is impracticable to perform this command, then and in that event, said defendant be and it is hereby commanded, to execute a proper assignment to the complainants, respectively, for the number of shares of said stock as they by this decree are respectively entitled to, and said defendant is hereby further com-

manded to attach thereto such certificates of said preferred stock as may be necessary, and to accompany same by a letter addressed to the General Cotton Securities Company, such letter to be signed by its proper officers, with the request, authorization and direction that said General Cotton Securities Company transfer on its books five thousand (5,000) shares of said preferred stock to Willard D. Doremus and twenty-five hundred (2,500) shares to Addison G. Du Bois, or their assigns, and to issue to and deliver to them or their assigns new certificates therefor and return to it (the defendant, the United States Trust Company), a certificate for the shares remaining after making such transfer. And said defendant is hereby directed to deliver such assignment or assignments, together with the necessary certificates of stock and the letter herein provided for, to the complainants' attorneys of record, such delivery to be made within ten days from the date of the execution of this decree.

"The costs in this court will be taxed, one-half against the plaintiffs and one-half against defendants, Hammond, Sully and Bright."

On the 16th of June, 1913, Mr. Gittings, counsel for Mr. Du Bois and Mr. Doremus, delivered to John J. Lordan, a member of the Bar of New York City, a certificate issued by Ralph Polk Buell, president of the General Cotton Securities Company, to John Hays Hammond, Daniel J. Sully and F. S. Bright, voting trustees for 29,965 shares of the common capital stock of said company, and the following letter:

"Washington, D. C., June 4th, 1913.
Transfer Officers,
    General Cotton Securities Company,
        A Delaware Corporation.
Under and by virtue of a decree passed on the 2nd day of June, 1913, by the Supreme Court of the District of Columbia, in cause Equity No. 30002, entitled Willard D. Doremus and Addison G. Du Bois,

against National Cotton Improvement Company and others, a certified copy of which decree is hereunto attached, we, the undersigned, as voting trustees, out of 29,965 shares of the common stock represented by certificate No. 14, General Cotton Securities Company, in the name of John Hays Hammond, Daniel J. Sully and F. S. Bright, voting trustees, which certificate is hereunto attached, assign and transfer unto Willard D. Doremus, or his assigns, four thousand, five hundred and fifty (4,550) shares, and unto Addison G. Du Bois, or his assigns, two thousand, two hundred and seventy-five (2,275) shares, and we do hereby irrevocably constitute and appoint          attorney, to transfer the said stock on the books of the said company, with full power of substitution in the premises; and we do hereby authorize and direct the said General Cotton Securities Company to transfer the aforesaid shares on the books of the company to the persons above named, and to issue and deliver to them, or their assigns, new stock certificates therefor.

John Hays Hammond,

Frank S. Bright,

D. J. Sully,

Voting Trustees."

He also delivered to Mr. Lordan a copy of the decree of the Supreme Court of the District of Columbia; a certificate issued by John Hays Hammond, president of the General Cotton Securities Company, March 4th, 1910, to Daniel J. Sully, syndicate manager, for 10,000 shares of the preferred stock of the said company, and the following letter from the secretary of the United States Trust Company of Washington:

"United States Trust Company,

Washington, D. C., June 13, 1913.

General Cotton Securities Company,

71 Broad street, New York City.

Gentlemen:

Pursuant to the terms of a decree of the Supreme Court of the District of Columbia, passed on June 2,

1913, in the case of Willard D. Doremus *et al.* vs. John Hays Hammond and others, Equity 30002, we are enclosing you herewith certificates A-7 for 10,000 shares of the preferred capital stock of the General Cotton Securities Company, with a request authorization and direction, as provided in said decree, that you transfer on your books 5,000 shares of the said preferred stock called for by said certificate to Willard D. Doremus, and 2,500 shares to Addison G. Du Bois, or their assigns, and to issue and deliver to them, or their assigns, new certificates therefor, and return to this company a new certificate for 2,500 shares to be issued in the name of Daniel J. Sully, syndicate manager. We are advised by the attorneys in the case that Mr. Sully, in whose name this certificate is made, will endorse enclosed certificate so as to enable you to make the transfer hereinbefore requested.

Very truly yours,

J. H. Borden,<br>Secretary."

Mr. Lordan took the certificates, letters and copy of the decree to Mr. Campbell, secretary of the General Cotton Securities Company, who was in the office of Mr. John Hays Hammond, and asked him to transfer the stock in accordance with the letters annexed to the certificates. Mr. Campbell told him that the books of the company were not in the office, but had been sent to the resident agent in Wilmington, Delaware, and that he could not therefore make the transfer, and declined to take the certificates. Mr. Lordan then went to see Mr. Atherton, treasurer of the General Cotton Securities Company, on the 17th of June, and presented the certificates, letters and copy of the decree and requested him to make the transfer of the stock. Mr. Atherton, according to Mr. Lordan's testimony, told him that he had no authority to do so; that the books were in the office of Mr. Baldwin, the attorney for the company, and that he would not make the transfer unless he received instructions to that effect from

the attorney. Mr. Atherton testified that when Mr. Lordan
presented the certificates of stock, etc., some time in July, he
told Mr. Lordan that he could not transfer the stock; that,
in the first place, he did not have the stock books in his pos-
session, and did not know where they were, and, in the sec-
ond place, the certificates would necessarily have to be signed
by Mr. Hammond, and that Mr. Hammond was out of the
city, and, in the third place, that he would not transfer the
stock without the advice of counsel. He further testified as
follows: "Have you had any experience in corporation af-
fairs? A. Yes, sir. Q. And you say you told him that you
would not transfer the stock even if the certificates were
signed by the President, without the advice of counsel? A.
Yes, sir. Q. What, if anything, did Mr. Hammond do or
say to you along about that time to prevent or influence your
action in the transferring or non-transferring of that stock?
A. Nothing whatever. I had not seen Mr. Hammond." After
his interview with Mr. Atherton, Mr. Lordan received the
following letter from Mr. Baldwin, dated July 31st, 1913:

"John J. Lordan, Esq.,

115 Broadway, New York City.

Dear Sir:

I have been unable so far to get any instructions as
to the transfer of the certificates of the General Cotton
Securities Company, but have advised the company
that in my opinion the stock having been lawfully can-
celled, the certificates therefor are void.

Regretting the delay, which I trust has not incon-
venienced you, in replying to your correspondent, I re-
main,

Very truly yours,

Wm. Woodward Baldwin."

Mr. Hammond stated in his testimony that the certificate
had never been presented to him and that he had not been
requested to transfer the stock. At the time of the demand
made upon Mr. Campbell and Mr. Atherton, he was at his

home in Gloucester, Massachusetts, and he did not hear anything of it until some time thereafter when he heard of it through Mr. Baldwin; that he never gave Mr. Baldwin any instructions in reference to the matter, and when he heard of Mr. Lordan's request through Mr. Baldwin, he said to Mr. Baldwin: "Well, now, Baldwin, this is a legal question, and it is up to you as attorney of the company." When he was asked what he meant by saying that it was a legal question, he said that on November 23rd, 1910, the stock had been called in and cancelled at the meeting of the board of directors of that date. That he knew, as a business man, that it would be dishonest for him to sign certificates of fully paid-up stock when the consideration for that stock had been returned to Mr. Miller, and when the stock represented no assets. "In other words, I would be committing fraud and certainly should not have done it unless I had the very best legal advice or possibly even an order of the court to protect myself."

It further appears that there had never been any meeting of the directors of the General Cotton Securities Company after the meeting of November 23rd, 1910. At that time all of the stock of the National Cotton Improvement Company, which represented the patent rights to the Doremus invention of the cotton gin and improvements thereon, and which represented the only assets of the General Cotton Securities Company, was turned over to Mr. Miller, and the stock of the latter company had been declared cancelled by the board of directors. Mr. Hammond, in 1913, had no interest in the National Cotton Improvement Company, and had upon his return from Russia in the early part of 1911 resigned as the president of that company.

On the 21st of May, 1915, Addison G. DuBois brought this suit in the Superior Court of Baltimore City against John Hays Hammond. The declaration alleges that the plaintiff was, on the 23rd day of November, 1910, lawfully in possession of a certain certificate or certificates represent-

ing 2,500 shares of the preferred stock of the General Cotton
Securities Company and 2,275 shares of the common stock
of said company; that he on said day lost said stock, and
that the same came into possession of the defendant by find-
ing.

> "Yet, defendant, well knowing the said certificates
> to be the property of the said plaintiff and rightfully
> to belong and appertain to him, but contriving and
> fraudulenty intending craftily and subtly to deceive
> and defraud the plaintiff in this behalf, has not as yet
> delivered said certificates to the plaintiff, although
> often so requested to do, and has hitherto wholly re-
> fused so to do; and afterwards, to wit, on or about
> the twenty-third day of June, 1913, at the place afore-
> said, converted and disposed of said certificates of stock
> to his own use.
>
> "Wherefore the plaintiff says he is injured and has
> sustained damages to the amount of $477,500. Where-
> fore the plaintiff brings this suit and claims dam-
> ages in the sum of four hundred, seventy-seven thou-
> sand, five hundred dollars, exclusive of all interests
> and costs of this suit."

The second count of the declaration, which was filed on
the 21st day of November, 1916, is substantially the same
as the first. The defendant pleaded that he did not commit
the wrong alleged, and also filed a special plea to which refer-
ence need not here be made. To the second count the defend-
ant pleaded the general issue plea, the plea of limitations,
and a further plea to which it is unnecessary to refer. The
trial of the case in the Superior Court, which apparently
extended over a period of several weeks, and the record of
which contains between fifteen and sixteen hundrd printed
pages, resulted in a verdict for the plaintiff for $238,750.00,
which was reduced by the Court to $123,775.00, for which
amount the judgment from which this appeal is taken was
entered in favor of the plaintiff.

The Record contains fifteen exceptions, the last one of which relates to the ruling of the Court on the prayers. The Court below granted the plaintiff's second prayer as follows:

"The jury are instructed as a matter of law that the plaintiff's title to the stock mentioned in the declaration is settled by the decree of the Supreme Court of the District of Columbit in Equity Cause 30002, and when the plaintiff presented the decree of said Court, defendant's letter and said stock to the proper officers of the corporation for transfer (if the jury so find), then he had the right to have it transferred on the corporation books to his name and certificates for his shares issued to him, and if the jury find from the whole evidence, the defendant personally, or by his agents or attorney, prevented that being done, defendant was guilty of a conversion of said stock and their verdict should be for plaintiff."

The Court rejected the prayers of the defendant, asserting that the plaintiff had offered no legally sufficient evidence, under the pleadings, of any conversion by the defendant of the certificates of stock or shares of stock of the General Cotton Securities Company mentioned in the declaration, and that the verdict of the jury should therefore be for the defendant.

The primary and important question to be determined is, therefore, whether the Record contains any legally sufficient evidence of a conversion by the defendant of the stock mentioned in the declaration. In considering this question it is necessary to keep in view the precise nature of the inquiry. In the case of *Dietus* v. *Fuss,* 8 Md. 148, the Court used this language: "Before expressing an opinion in reference to the plaintiff's third prayer it is proper to notice some of the principles relating to the subject of conversion, for the action of trover cannot be maintained without a conversion. It may be either direct or constructive, and therefore may be proved directly or by inference. When the plaintiff fails in proving an actual conversion it will be necessary for him to give

evidence of a demand and refusal having been made at a
time when the defendant had the power to give up the goods.
A demand and refusal are only evidence of a prior conver-
sion, which may be explained and rebutted by evidence to
the contrary.   2 *Greenl. Ev.*, secs. 642, 644; *Edwards* v.
*Hooper,* 11 Mess. & Wels. 363."

In the case of *Manning* v. *Brown,* 47 Md. 506, JUDGE
ALVEY said: "There is nothing in the facts stated, and which
have been found by the jury, that would, in the least, justify
a pretension that there had been any such conversion of the
personal effects of the plaintiff as would entitle him to recover
under the first count of his declaration.   There was no evi-
dence whatever of any intention on the part of the defend-
ants either to take to themselves the property in the goods,
or in any manner to deprive the plaintiff of them.   To
entitle him to recover on the count in trover, such proof
would have been required.   *Dietus* v. *Fuss,* 8 Md. 148; *Sim-
mons* v. *Lillystone,* 8 Exch. 431, 442; *Burroughes* v. *Bayne,*
5 H. & N. 296; *Pillott* v. *Wilkinson,* 2 H. & Colt. 72."   In
the case of *Balto. Marine Ins. Co.* v. *Dalrymple,* 25 Md.
269, the Court said: "In the case last cited (*Edwards* v.
*Hooper,* 11 M. & W. 362), the plaintiff's assignee in bank-
ruptcy relied on a demand and refusal as the ground of
their action, the conversion having taken place before the
*fiat* in bankruptcy, it was held the suit could not be main-
tained.   *Parke, Baron,* said: 'if the goods were in possession
of the defendants, a demand and refusal would be evidence
of a conversion.   But it is not so in a case where the goods
have been previously parted with by sale.   There cannot be
an effectual demand and refusal unless the party has at the
time possession of the goods and has the means of deliver-
ing them up.'   In 2 *Greenl. Ev.*, sec. 644, the effect of a de-
mand and refusal is correctly stated, and many cases cited.
In *Dietus* v. *Fuss,* 8 Md. 158, the case in 11 M. & W. 362,
and the sections of *Greenleaf* on this subject were cited and
approved.   It follows from these authorities that the demand

and refusal in this case could have no effect either in giving
to the plaintiff a right of action, or to fix the measure of
damages." In a more recent case of *Merchants Bank* v.
*Williams,* 110 Md. 334, JUDGE BURKE, speaking for this
Court, said: "Conversion, in the sense of the law of trover,
consists either in the appropriation of the property of an-
other, or in its destruction, or in exercising dominion over it
in defiance of the owner's rights, or in withholding the
possession from him under an adverse claim of title, and
all who aid, command, assist or participate in the commis-
sion of such unlawful acts are liable. In this case the bank,
accepting for its own benefit, the stock from Wilson Colston
& Co., with notice of their want of authority to hypothecate,
became by that act jointly liable with that firm for the con-
version of the plaintiff's goods, which took place on the 17th
of September, 1907." In the case of *Smith* v. *Young,* 1
Camp, 439, LORD ELLENBOROUGH said: "The defendant
would have been guilty of a conversion if it had been in
his power; but the intention is not enough. There must be
an actual tort. To make a demand and refusal sufficient evi-
dence of a conversion, the party when he refuses must have
it in is power to deliver up, or to detain the articles de-
manded."

Applying these principles to the facts in this case, it is
apparent that there is not the slightest evidence of the con-
version of the stocks in question by Mr. Hammond on the
23rd day of June, 1913. So far as the evidence discloses,
the books of the General Cotton Securities Company were
not in his possession or in the possession of his agents. No
demand was made upon him to transfer the stock, and, ac-
cording to the uncontradicted evidence he had no knowledge
of the demand upon Mr. Atherton and Mr. Campbell until
long after it was made, and he had never given them any in-
structions in reference thereto. There is evidence tending to
show that Mr. Campbell was also employed by Mr. Ham-
mond, but the demand made upon him was made upon him

as the secretary of the General Cotton Securities Company, and he declined to make the transfer except under advice of counsel for the company. Mr. Baldwin, to whom Mr. Hammond had given no instructions in reference to the matter, wrote Mr. Lordan that he had been unable to get any instructions as to the transfer of the stock, but that he had advised the company that, in his opinion, the stock having been lawfully cancelled, the certificates therefor were void. The fact that Mr. Campbell was also employed by Mr. Hammond, and that Mr. Baldwin was also counsel for Mr. Hammond, would not justify an inference that in what they did and said they acted as the agents of Mr. Hammond, and not as the secretary and counsel of the company, when the evidence is to the effect that they were not approached as the agents of Mr. Hammond, and that Mr. Hammond had no knowledge of the alleged demand, and gave no instructions to either of them in reference to the transfer of the stock. It is true, a principal may, by his subsequent ratification or acquiescence, become liable for the unauthorized acts of his agents, but this principle presupposes that the act complained of was the act of one *as the agent,* or on behalf of the principal. In this case there is no proof to warrant the view that in what Mr. Baldwin, Mr. Campbell and Mr. Atherton did, or refused to do, they acted as the agents of Mr. Hammond, because, as we have said, the evidence shows that he had given them no instructions in reference to the matter, and they were only called upon to act as the *officers of the company.*

The Court below in granting the plaintiff's prayer proceeded upon the theory, and the learned counsel for the appellee contended in this Court, that the decree of the Supreme Court of the District of Columbia determined the plaintiff's right to a transfer of the stock on the books of the General Cotton Securities Company. But it is obvious that the decree could not have that effect, and that the learned Judge of that Court did not intend so to decree. The General Cot-

ton Securities Company was not a party to that suit, and no decree could have been passed affecting its interests.

It is not necessary in this case to determine whether this Court can properly pass upon the legality of the proceedings of the board of directors of the General Cotton Securities Company on the 23rd of November, 1910. The only question here involved is whether the conduct of Mr. Baldwin, Mr. Campbell and Mr. Atherton amounted to a conversion of the stock by Mr. Hammond. If the demand had been made upon Mr. Hammond, as the president of the company, to transfer the stock, it might be questioned whether, in view of the resolution of the board of directors of the company, he would have been authorized to make the transfer without some previous action of or authority from the board of directors.

Among other cases cited and relied on by the appellee is the case of *Travis* v. *Knox Terpezone Co.,* 215 N. Y. 259, 109 N. E. 250. It may be noted, however, that in that case that the defendants, Rogers and Skinner, who were the president and treasurer of the corporation, joined with the defendant company in a formal refusal to transfer the stock. In this case there was no demand made upon Mr. Hammond, and no refusal on his part to make the transfer desired.

It follows from what has been said that the plaintiff below failed to make out a case of a conversion of the stock in question by Mr. Hammond, and the judgment of the Court below must therefore be reversed, without awarding a new trial.

> *Judgment reversed, with costs, without awarding a new trial.*